IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

<table>
<tr><td>TRANSOCEAN OFFSHORE<br>DEEPWATER DRILLING, INC.,</td><td>§<br>§<br>§</td><td></td></tr>
<tr><td>Plaintiff,</td><td>§<br>§</td><td></td></tr>
<tr><td>v.</td><td>§<br>§</td><td>CIVIL ACTION NO. H-03-2910</td></tr>
<tr><td>GLOBALSANTAFE CORP.,<br>GLOBAL MARINE, INC.,<br>GLOBAL SANTA FE DRILLING CO.,<br>and GLOBAL MARINE DRILLING CO.,</td><td>§<br>§<br>§<br>§<br>§</td><td></td></tr>
<tr><td>Defendants.</td><td>§</td><td></td></tr>
</table>

## MEMORANDUM OPINION AND ORDER

Pending before the court is Plaintiff Transocean's Motion for
Partial Summary Judgment of Enforceability of the Transocean
Patents (Docket Entry No. 103).  For the reasons explained below
the pending motion will be granted in part and denied in part.

## I.   Introduction

Plaintiff, Transocean Offshore Deepwater Drilling, Inc.
(Transocean), brought this action against defendants, GlobalSantaFe
Corp., Global Marine, Inc., Global Santa Fe Drilling Co., and
Global Marine Drilling Co. (collectively, "GSF"), for direct
infringement of U.S. Patent No. 6,047,781 ('781 Patent), U.S.
Patent No. 6,056,071 ('071 Patent), U.S. Patent No. 6,068,069 ('069
Patent), and U.S. Patent No. 6,085,851 ('851 Patent) (collectively,

"the patents-in-suit").[1]  Although Transocean has recently filed an Amended Statement of Patent Claims to be Asserted (Docket Entry No. 139) stating that it intends to assert only two apparatus claims at trial -- claim 11 of the '781 patent and claim 17 of the '069 patent -- GSF has counterclaimed for declaratory judgment of noninfringement, patent invalidity, and/or unenforceability for all four of the patents-in-suit.[2]

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(c).  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but

---

[1]See Plaintiff Transocean's Amended Statement of Patent Claims to be Asserted, Docket Entry No. 139, stating that these two claims are the only claims that Transocean intends to assert at trial.

[2]Defendants' First Amended Answer to Transocean's Second Amended Complaint, Affirmative Defenses, and Amended Counterclaims, Docket Entry No. 83, ¶¶ 31-104.

need not <u>negate</u> the elements of the nonmovant's case." <u>Little v.</u>
<u>Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (<u>en banc</u>),
(quoting <u>Celotex</u>, 106 S.Ct. at 2553-2554).  If the moving party
meets this burden, Rule 56(c) requires the nonmovant to go beyond
the pleadings and show by affidavits, depositions, answers to
interrogatories, admissions on file, or other admissible evidence
that specific facts exist over which there is a genuine issue for
trial.  <u>Id.</u> (citing <u>Celotex</u>, 106 S.Ct. at 2553-2554).  "[T]he
nonmoving party's burden is not affected by the type of case;
summary judgment is appropriate in *any* case where critical evidence
is so weak or tenuous on an essential fact that it could not
support a judgment in favor of the nonmovant." <u>Id.</u>  In reviewing
the evidence "the court must draw all reasonable inferences in
favor of the nonmoving party, and it may not make credibility
determinations or weigh the evidence." <u>Reeves v. Sanderson</u>
<u>Plumbing Products Inc.</u>, 120 S.Ct. 2097, 2110 (2000). Factual
controversies are to be resolved in favor of the nonmovant, "but
only when . . . both parties have submitted evidence of
contradictory facts." <u>Little</u>, 37 F.3d at 1075.

## II.  <u>Enforceability of Transocean's Patents</u>

The first application for the patents-in-suit was filed on
May 3, 1996, and resulted in issuance of the '851 patent.[3]

---

[3]Plaintiff Transocean's Motion for Partial Summary Judgment of
Enforceability of the Transocean Patents (Transocean's Enforce-
ability Motion), Docket Entry No. 103, p. 3, and Exhibit 1 attached
thereto.

Additional applications filed as continuations of the first application resulted in issuance of the remaining three patents-in-suit.[4]  GSF alleges that each claim of the four patents-in-suit is unenforceable due to Transocean's inequitable conduct during their prosecution.[5]  Asserting that GSF mischaracterizes routine and immaterial actions as fraud, Transocean moves for partial summary judgment that the patents are enforceable because GSF cannot establish materiality and intent to deceive with clear and convincing evidence for each of six acts complained of by GSF.[6] GSF responds that "Transocean committed inequitable conduct with respect to three references: (1) the Maritime Hydraulics Twin Ram Rig brochure, (2) the GVA Twindriller sales brochure, and (3) documents regarding the ME 5500 rig."[7]

## A.    Applicable Law

Patent applicants have a duty to prosecute applications in the Patent and Trademark Office (PTO) with candor, good faith, and honesty.  Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed.

---

[4]Id. and Exhibits 2-4 attached thereto.

[5]Defendants' First Amended Answer to Transocean's Second Amended Complaint, Affirmative Defenses, and Amended Counterclaims, Docket Entry No. 83, ¶¶ 30, 62-104.

[6]Transocean's Enforceability Motion, Docket Entry No. 103, p. 1.

[7]GSF's Response to Transocean's Motion for Partial Summary Judgment of Enforceability of the Transocean Patents (GSF's Response), Docket Entry No. 113, pp. 3-4.

Cir. 1995) (citing <u>Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.</u>, 65 S.Ct. 993, 999 (1945) ("Those who have applications pending with the Patent Office or who are parties to Patent Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the application in issue.")).  This requirement is embodied in 37 C.F.R. § 1.56, which states that "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section."  This duty extends to both applicants and their attorneys.  <u>FMC Corp. v. Manitowoc Co., Inc.</u>, 835 F.2d 1411, 1415 n.8 (Fed. Cir. 1987).

"Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive."  <u>Novo Nordisk Pharmaceuticals, Inc. v. Bio-Technology General Corp.</u>, 424 F.3d 1347, 1359 (Fed. Cir. 2005) (citing <u>Molins</u>, 48 F.3d at 1178).  Determination of inequitable conduct entails a two-step analysis: (1) determining whether the misrepresentation or withheld reference meets a threshold level of materiality and intent to mislead; and (2) weighing materiality and intent "[i]n light of all the circumstances" to determine whether

-5-

the applicant's conduct is so culpable that the patent should be held unenforceable.  Baxter International, Inc. v. McGraw, Inc., 149 F.3d 1321, 1327 (Fed. Cir. 1998).  Materiality and intent are factual determinations, Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1379 (Fed. Cir. 2001), but the ultimate determination of whether inequitable conduct has occurred is an equitable issue committed to the court's discretion.  Id. (citing Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc)).

Inequitable conduct must be established by clear and convincing evidence.  See Abbott Labs. v. Torpharm. Inc., 300 F.3d 1367, 1379 (Fed. Cir. 2002).  A finding of inequitable conduct during prosecution of a patent application makes the patent unenforceable.  See LaBounty Manufacturing, Inc. v. United States International Trade Commission, 958 F.2d 1066, 1070 (Fed. Cir. 1992).  Moreover, a finding of inequitable conduct during prosecution of a parent patent application can render both the parent patent and all subsequent patents unenforceable.  See Consolidated Aluminum Corp. v. Foseco International, 910 F.2d 804, 809-812 (Fed. Cir. 1990).

1.  Materiality

PTO regulations define what information is material to patentability.  Purdue Pharma L.P. v. Endo Pharmaceuticals Inc., 438 F.3d 1123, 1129 (Fed. Cir. 2006) (citing 37 C.F.R. § 1.56(b)).

-6-

Since all the patents-in-suit were filed after March 16, 1992,[8] the current version of the PTO regulations applies.  <u>Id.</u>  These regulations state that

> information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim;  or
>
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
>
> > (i) Opposing an argument of unpatentability relied on by the Office, or
> >
> > (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b).  A reference is not "immaterial simply because the claims are eventually deemed by an examiner to be patentable

---

[8]"In 1992, the definition of materiality in 37 C.F.R. § 1.56 was revised . . . According to the PTO's notice of final rulemaking, the rule change applied to all applications pending or filed after March 16, 1992."  <u>Bruno Independent Living Aids, Inc. v. Acorn Mobility</u>, 394 F.3d 1348, 1352 (Fed. Cir. 2005).  "This new standard was not intended to constitute a significant substantive break with the pre-1992 standard."  <u>Purdue Pharma</u>, 438 F.3d at 1129, n.6 (citing <u>Hoffmann-La Roche, Inc. v. Promega Corp.</u>, 323 F.3d 1354, 1368 n.2 (Fed. Cir. 2003)).  Under the older standard information was deemed "material" when there was a "substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent."  <u>Molins</u>, 48 F.3d at 1179.  In a recent case the Federal Circuit noted that the "new" standard set out in the PTO regulations may be narrower than the older "reasonable examiner" standard.  <u>Digital Control Inc. v. The Charles Machine Works</u>, 437 F.3d 1309, 1316-1317 (Fed. Cir. 2006).  The court also noted, however, that both the "new" standard and the "reasonable examiner" standard are appropriately used in making a determination of materiality.  <u>Id.</u>  Although the "new" standard is applied here, the result would have been the same under either standard.

thereover." <u>Molins</u>, 48 F.3d at 1179 (citing <u>A.B. Dick Co. v.</u> <u>Burroughs Corp.</u>, 798 F.2d 1392, 1396 (Fed. Cir. 1986)).

Information cannot be material if cumulative of other information before the PTO. <u>See</u> <u>Digital Control, Inc. v. The</u> <u>Charles Machine Works</u>, 437 F.3d 1309, 1319 (Fed. Cir. 2006) ("[A] withheld otherwise material prior art reference is *not* material for the purpose of inequitable conduct if it is merely cumulative to that information considered by the examiner."); <u>Halliburton Co. v.</u> <u>Schlumberger Technology Corp.</u>, 925 F.2d 1435, 1440 (Fed. Cir. 1991) ("[A] patentee has no obligation to disclose an otherwise material reference if the reference is cumulative or less material than those already before the examiner."). One reference is cumulative of another reference if both disclose effectively the same design. <u>See</u> <u>Rolls-Royce Ltd. v. GTE Valeron Corp.</u>, 800 F.2d 1101, 1107 (Fed. Cir. 1986) (affirming judgment of no inequitable conduct where mere existence of "some structural differences" did not establish that those differences rendered the uncited reference more material to the claimed invention).

Affirmative misrepresentations are typically accorded a relatively high degree of materiality. <u>See</u> <u>Purdue Pharma</u>, 438 F.3d at 1133-1134 (The "omission of information was material, but not as material as an affirmative misrepresentation would have been."); <u>Rohm & Haas Co. v. Crystal Chemical Co.</u>, 722 F.2d 1556, 1571 (Fed. Cir. 1983) ("In contrast to cases where allegations of fraud are

based on the withholding of prior art, there is no room to argue
that submission of false affidavits is not material.").

    2.  <u>Intent</u>

"Intent need not be proven by direct evidence; it is most
often proven by a showing of acts, the natural consequences of
which are presumably intended by the actor." <u>Molins</u>, 48 F.3d at
1180.  Intent must generally be inferred from the facts and
circumstances surrounding the applicant's conduct. <u>Id.</u> "Intent to
deceive, however, cannot be 'inferred solely from the fact that
information was not disclosed; there must be a factual basis for a
finding of deceptive intent.'" <u>Purdue Pharma</u>, 438 F.3d at 1134
(quoting <u>Hebert v. Lisle Corp.</u>, 99 F.3d 1109, 1116 (Fed. Cir.
1996)).  False statements, coupled with "knowledge of falsity is
predicate to intent to deceive." <u>Hebert</u>, 99 F.3d at 1116.
Affirmative misrepresentations are typically accorded a relatively
high degree of materiality, from which intent may be inferred. <u>See</u>
<u>Purdue Pharma</u>, 438 F.3d at 1133-1134.  However, "such an inference
is not required in every case, even when the misrepresentation is
in affidavit form." <u>Monsanto Co. v. Bayer Bioscience N.V.</u>, 363
F.3d 1235, 1241 (Fed. Cir. 2004).

**B.  Analysis**

    GSF contends that Transocean committed inequitable conduct
with respect to three references: (1) the Maritime Hydraulics Twin

-9-

Ram Rig, (2) the GVA Twindriller, and (3) the Maritime Engineering ME 5500.[9]  To survive summary judgment GSF must introduce clear and convincing evidence from which a trier of fact could find materiality and intent, Abbott Labs. v. Torpharm. Inc., 300 F.3d 1367, 1379 (Fed. Cir. 2002), that is, evidence capable of creating an abiding conviction that the truth of GSF's factual contentions is "highly probable."  Colorado v. New Mexico, 104 S.Ct. 2433, 2437-2438 (1984).  See also Buildex Inc. v. Kason Industries, Inc., 849 F.2d 1461, 1463 (Fed. Cir. 1988).

    1.   Maritime Hydraulics' Twin Ram Rig

GSF alleges that Transocean committed inequitable conduct with respect to Maritime Hydraulics' Twin Ram Rig by

> (1) misrepresenting the history of drawings of the Maritime Hydraulics Twin Ram Rig and the reason that those drawings were created; (2) misrepresenting the capabilities of the Twin Ram Rig; (3) failing to disclose the front page of a fax from Maritime Hydraulics that revealed information regarding the history of the Twin Ram Rig; [and] (4) misrepresenting the content of an Appendix to a Declaration of Prior Invention that Transocean failed to submit to the PTO.[10]

Transocean argues that it is entitled to judgment as a matter of law that it did not act inequitably with respect to the Twin Ram Rig reference because it disclosed the reference to the PTO.

---

[9]GSF's Response, Docket Entry No. 113, pp. 3-4.

[10]Defendants' First Amended Answer to Transocean's Second Amended Complaint, Affirmative Defenses, and Amended Counterclaims, Docket Entry No. 83, ¶ 64.

(a)  Undisputed Facts

In late 1995 inventor Robert Herrmann began consulting with Sonat Offshore Drilling, now known as Transocean Offshore Deepwater Drilling, Inc. and the plaintiff in this action, to design a new, more efficient offshore drilling rig.[11]  The design effort was known as Project Enterprise and it involved not just Herrmann, but also, Robert Scott and Donald Ray.[12]  On February 23, 1996, Herrmann, Scott, and Ray met with Bradford Kile, Transocean's patent attorney, to discuss the patentability of their concepts.[13]

Between March 4 and 14, 1996, Maritime Hydraulics' marketer, Vidar Skjelbred, made a business trip to Houston during which he met with Scott.[14]  Scott asked Skjelbred for a price quote on equipment that could be used to transfer pipe between two drill centers.[15]  Scott did not tell Skjelbred that the pipe handling equipment would be used to facilitate simultaneous operations on a

---

[11]Declaration of Robert Herrmann (Hermann Declaration), included in Exhibits to Plaintiff Transocean's Response to and Cross-Motion for Partial Summary Judgment Concerning Conception Date, Docket Entry No. 98, ¶ 2.

[12]Id. at ¶¶ 3-4.

[13]Declaration of Bradford Kile (Kile Declaration), included in Exhibits to Plaintiff Transocean's Response to and Cross-Motion for Partial Summary Judgment Concerning Conception Date, Docket Entry No. 98, ¶ 24.

[14]Id. at p. 46.

[15]Id. at p. 39.  See also Scott Deposition, Exhibit 3 attached to GSF's Opposition to Transocean's Motion for Partial Summary Judgment on Prior Art, Docket Entry No. 114, pp. 100-101.

-11-

single well.[16]  During the meeting Skjelbred presented information about the Twin Ram Rig to Scott.[17]  The Twin Ram Rig was a new rig for which drawings had only recently been completed and provided to Norwegian contractor Smedvig on February 21, 1996.[18]

On March 19, 1996, Skjelbred sent a facsimile to Scott that included both the price quote for pipe handling equipment that Scott had requested and drawings of the Twin Ram Rig.[19]  The cover letter stated

> Please find enclosed some technical info regarding our twin Ram Rig.
>
> We are at present doing a study to install a twin rig, one rated for 600mT and one for 300mT.
>
> The price and weight for this set-up will be approx. same as a conventional 650 ton rig.
>
> Regarding your twin rig's pipehandling system we haven't been able to make any details, however our best estimate is USD 3.0 mill.
>
> This includes fingerboards, handling arms and control system.
>
> We hope you are interested in our Ram Rig concept and look forward to discuss it.[20]

---

[16]Scott Deposition, Exhibit 3 attached to GSF's Opposition to Transocean's Motion for Partial Summary Judgment on Prior Art, Docket Entry No. 114, pp. 101-102.

[17]Skjelbred Deposition, Exhibit 4 attached to Plaintiff Transocean's Motion for Partial Summary Judgment on Prior Art, Docket Entry No. 108, p. 40, and Exhibit 7 attached to GSF's Opposition to Transocean's Motion for Partial Summary Judgment on Prior Art, Docket Entry No. 114, p. 40.

[18]Id. at pp. 17-20, 143.

[19]Id. at pp. 46-47.

[20]Exhibit 3 attached to GSF's Response, Docket Entry No. 113.

Scott forwarded the Twin Ram Rig drawings to patent attorney Kile, who acknowledged their receipt in a March 21, 1996, letter to Scott that stated:

> Thank you for forwarding to me a copy of twelve preliminary concept drawings from Maritime Hydraulics. My initial impression is that these drawings depict a dual derrick system somewhat similar to the dual derrick system disclosed in United States Williford etal patent No. 4,819,730 which was included in my patentability report of March 20th.   One difference is that the Maritime Hydraulics design shares a single common leg for both derricks and performs over a single drilling site.[21]

On May 3, 1996, Kile filed the application for the parent patent ('851) of the four patents-in-suit for Transocean.[22]   GSF contends, and Transocean does not dispute, that

> on May 12, 1997, in connection with the prosecution of the '851 Patent, Transocean filed with the PTO a "Supplemental Information Disclosure Statement" attaching, *inter alia*, a complete copy of the materials regarding the Twin Ram Rig that Maritime Hydraulics attached to its March 19, 1996 facsimile to the inventors. . . The only part of the 3/19/96 facsimile that Transocean did not file with the PTO was the cover letter accompanying the above materials.[23]

---

[21]March 21, 1996, letter from Kile to Scott, Exhibit 12 attached to GSF's Opposition to Transocean's Motion for Partial Summary Judgment on Prior Art, Docket Entry No. 114.

[22]Declaration of Bradford Kile (Kile Declaration), included in Exhibits to Plaintiff Transocean's Response to and Cross-Motion for Partial Summary Judgment Concerning Conception Date, Docket Entry No. 98, ¶ 24.   The May 3, 1996, filing date is also indicated on the first page of each of the patents-in-suit.   See Exhibits 1-4 attached to Docket Entry No. 103.

[23]See Reply to GSF's Response to Plaintiff Transocean's Motion for Partial Summary Judgment of Enforceability of the Transocean Patents (Reply to GSF's Response), Docket Entry No. 131, p. 3.

In October of 1997 the patent examiner rejected claims 11-14, 16-18, 20-22, and 27-48 of Transocean's application as anticipated by the Twin Ram Rig under 35 U.S.C. § 102(a) because

> [t]he Marine Hydraulics "Ram Rig" Sales Brochure discloses an offshore platform for supporting a derrick that encloses and supports a pair of pipe handling and pipe advancing assemblies. From the brochure it appears that simultaneous drilling and/or workover operations can be performed with the pairs of assemblies. The Marine Hydraulics "Ram Rig" Sales Brochure shows many tubular racks for the various pipes used for drilling and completion of an offshore well. It is also apparent that pipe handling assemblies allow for transfer of pipes from one advancing station to the other.[24]

On February 2, 1998, Kile and Ray met with the examiner, and based on Ray's explanation of "offshore drilling operations using a single rig and [Transocean's] two rig system," the examiner allowed the claims explaining that "the distinction that applicant's drillship allows for transfer of tubular members between the first and second drilling assemblies was agreed to define over . . . the Maritime Hydraulics Brochure (see attachment A for changes to claims). Applicant to submit formal amendment."[25] Following Ray's meeting with the examiner Transocean submitted an amended claim 4 that added the following language: "and means positioned within said derrick for transferring tubular assemblies between said first means for advancing tubular members and said

---

[24]October 20, 1997, Office Action, Exhibit 5 attached to GSF's Response, Docket Entry No. 113 at TG000238.

[25]Examiner Interview Summary Record, Exhibit 6 attached to GSF's Response, Docket Entry No. 113 at TG000241.

second means for advancing tubular members to facilitate simultaneous drilling operations and operations auxiliary to said drilling operations."[26]

On August 17, 1999, during prosecution of the '071 patent the PTO examiner rejected claims 11-13, 16-21, 23-27, 29-31, and 41-65 under 35 U.S.C. § 102(a) as being anticipated by Maritime Hydraulics' "Ram Rig" Sales Brochure because the

> Ram Rig discloses an offshore platform for supporting a derrick that encloses and supports a pair of pipe handling and pipe advancing assemblies. Simultaneous drilling and/or workover operations can be performed with the pair of assemblies. Many different tubular racks are disclosed and the pipe handling assemblies allow for transfer of pipes from one advancing means to the other.[27]

In an effort to overcome the examiner's rejection Transocean submitted a declaration of prior invention in which its inventors stated that while seeking proposals for various components of their invention they

> disclosed the subject invention to Maritime Hydraulics during a meeting at Transocean Offshore in early February 1996. Thereafter, on or about March 19, 1996, Transocean received from Maritime Hydraulics the Preliminary Proposal that the undersigned inventors believe was an adaptation by Maritime Hydraulics of its Ram Rig technology which attempted to reflect certain features and functional requirements of the invention of Transocean Offshore which were discussed at the meeting. Drawings in that Preliminary Proposal to Transocean bear a date of February 20, 1996. Furthermore, the adaptation by Maritime Hydraulics does not incorporate a principal aspect of the invention in that there is no method shown

---

[26]_Id._ at p. TG000243.

[27]August 17, 1999, Office Action Summary, Exhibit 11 attached to GSF's Response, Docket Entry No. 113, at TG000718).

-15-

for transferring tubular members between the rotary
tables in the Ram Rig document.[28]

Transocean's inventors also stated that

> [p]rior to the February 20, 1996 date of the Maritime
> Hydraulics Preliminary Proposal drawings, the undersigned
> inventors conceived all of the elements of the presently
> claimed invention, and of the means and ways to carry out
> the invention, and the practical utility of the
> invention.[29]

### (b)  Materiality and Intent to Deceive

Transocean argues that it is entitled to judgment as a matter

of law that it did not act inequitably with respect to the Twin Ram

Rig reference because it disclosed the reference to the PTO.  GSF

responds that

> Transocean committed inequitable conduct regarding the
> Maritime Hydraulics Twin Ram Rig brochure by repeatedly
> misrepresenting that the brochure did not disclose the
> transfer of tubulars between the two drilling stations,
> even though they knew better.  In addition, Transocean
> misrepresented that it disclosed its invention to
> Maritime Hydraulics in February 1996 and that Maritime
> Hydraulics thereafter adapted its Twin Ram Rig to
> Transocean's invention.[30]

### (1)  Transfer of Tubulars

GSF argues that when Ray met with the PTO examiner in 1998 to

explain offshore drilling operations using Transocean's invention,

---

[28]November 11, 1999, Declaration of Prior Invention in the
United States Under 37 C.F.R. § 1.131, executed by Transocean's
three inventors, Robert Scott, Robert Herrmann, and Donald Ray,
Exhibit 12 attached to GSF's Response, Docket Entry No. 113, ¶ 4.

[29]Id. at ¶ 5.

[30]GSF's Response, Docket Entry No. 113, p. 4.

that according to Ray's notes the Twin Ram Rig differed from
Transocean's invention for the following reasons

— cannot move drill pipe from one rotary to the other

— structural obstacles
— no means to transfer pipes
— no common setback.[31]

GSF argues that although Ray told the examiner that the Twin Ram
Rig had structural obstacles that prevented the transfer of
tubulars between the two drilling stations, that Ray testified at
his deposition that there were no such obstacles.[32]  GSF argues that
although Ray told the examiner that the Twin Ram Rig had no common
setback area, that Scott testified at his deposition that the Twin
Ram Rig drawings did not show anything that prevented movement from
one part of the setback area to the other, and that although Ray
told the examiner that the Twin Ram Rig did not allow the transfer
of tubulars between the first and second drilling stations and had
no means to transfer pipes, that Scott testified at his deposition
that the Twin Ram Rig drawings disclose the transfer of tubulars
between the two drilling stations.[33]

     GSF argues that Ray's false statements to the PTO examiner
were material because Ray testified that he believed that

———————————

[31]Exhibit 7 attached to GSF's Response, Docket Entry No. 113.

[32]GSF's Response, Docket Entry No. 113, p. 8 (citing Ray
Deposition, Exhibit 8 attached thereto, p. 89).

[33]Id. (citing Scott deposition, Exhibit 1 attached thereto,
pp. 158-161).

transferability between the drill stations was an essential part of Transocean's invention, that transferability between drilling stations was the feature that distinguished Transocean's invention from Maritime Hydraulics' Twin Ram Rig, and that transferability was the basis on which the examiner allowed Transocean's patent to issue over the Twin Ram Rig.[34]

Citing <u>Akzo N.V. v. United States International Trade Commission</u>, 808 F.2d 1471, 1482 (Fed. Cir. 1986), and <u>Life Tech., Inc. v. Clontech Labs., Inc.</u>, 224 F.3d 1320, 1326 (Fed. Cir. 2000), Transocean argues that "[e]ven assuming for the purposes of this motion only that Ray's statements were inaccurate (which Transocean denies), Ray's arguments to the PTO advocating his interpretation of what the Twin Ram Rig reference discloses does not constitute inequitable conduct as a matter of law."[35]  Transocean argues that in the cited cases the Federal Circuit

> held that an applicant's mere statements of belief regarding what a reference discloses (e.g., how a reference is distinguishable from the claimed invention) are not material misrepresentations because the Examiner — who has the reference in his possession and is presumed to be one of ordinary skill in the art — is free to accept or reject the applicant's interpretation of the reference in question.[36]

Transocean argues that this rule applies with particular force to this case because Ray was simply offering his belief as to what

---

[34]Ray Deposition, Exhibit 8 attached to GSF's Response, Docket Entry No. 113, p. 89.

[35]Reply to GSF's Response, Docket Entry No. 131, p. 5.

[36]<u>Id.</u>

was disclosed by Maritime Hydraulics' Twin Ram Rig drawings, which were documents that he neither created nor possessed special knowledge about.[37]

In Akzo, 808 F.3d at 1482, the Federal Circuit held that a non-patentee was not entitled to summary judgment that a patentee had engaged in inequitable conduct where the non-patentee failed to prove the existence of either a material misrepresentation or an intent to mislead.  The court did not hold that where, as alleged here, material misrepresentations are made in a position advocated to the PTO with intent to mislead, inequitable conduct does not exist.  See Semiconductor Energy Laboratory, Co., Ltd. v. Samsung Electronics Co. Ltd., 24 F.Supp.2d 537, (E.D. Va. 1998), aff'd, 204 F.3d 1368 (Fed. Cir. 2000), cert. denied, 121 S.Ct. 1187 (2002).  Accordingly, the court is not persuaded that Akzo supports Transocean's pending motion for summary judgment.

In Life Technologies the inventors were faced with rejections for obviousness based on the combined teachings of two prior art references.  In response to the rejections, the inventors argued that the combination did not render the invention obvious because when the invention was made one of ordinary skill in the art would not have had a reasonable expectation of success in applying the teachings of the prior art.  The district court found that the inventors' argument was a misrepresentation because the inventors

---

[37]Id.

later admitted that the prior art reference at issue correctly taught them to make the claimed invention.  Although the district court found that the inventors could not truthfully argue lack of reasonable expectation of success as a basis for non-obviousness when they successfully used the prior art reference, the Federal Circuit held that the district court erred.  Explaining that the inventors had merely advocated a particular interpretation of the teachings of the prior art and the level of skill in the art that the examiner was free to accept or reject, the Federal Circuit concluded that the inventors' arguments could not give rise to a finding of misrepresentation because they did not contain any factual assertions.  Id. at 1326.

Unlike the arguments at issue in Life Technologies, Ray's alleged assertions that the Twin Ram Rig could not move drill pipe from one rotary to the other due to "structural obstacles," "no means to transfer pipes," and "no common setback,"[38] are factual assertions that appear to be contradicted by the inventors' deposition testimony.  Moreover, even if Ray's assertions are merely statements of belief, as Transocean argues, the court is not persuaded that they are incapable of supporting a claim for inequitable conduct if Ray lacked a reasonable basis for holding and/or asserting such beliefs.  Since a reasonable fact-finder could conclude from the Ray and Scott deposition testimony cited by

_____

[38]Exhibit 7 attached to GSF's Response, Docket Entry No. 113.

GSF that Ray lacked a reasonable basis for making these representations to the PTO examiner, the court concludes that genuine issues of material fact preclude it from granting Transocean judgment as a matter of law that Ray's representations to the PTO examiner were neither material nor made with an intent to deceive.

### (2)  Disclosure and Adaptation

GSF argues that when in 1999 Transocean's inventors filed their Declaration of Prior Invention stating that they had disclosed their invention to Maritime Hydraulics in February of 1996, and that Maritime Hydraulics thereafter adapted its Twin Ram Rig to Transocean's invention,[39] Transocean engaged in inequitable conduct because Transocean's inventors knew that they had not disclosed "what Transocean now claims is the key feature of its invention:  using two drill stations to work simultaneously on a single well."[40]  Asserting that Scott admitted in his deposition that he did not tell Skjelbred that Transocean's invention was intended to work on a single well, and that Transocean has now admitted that the meeting between Scott and Skjelbred occurred in March and not February, GSF argues that Transocean's statements in the declaration that the disclosure was made and that it was made

---

[39]GSF's Response, Docket Entry No. 113, p. 4.

[40]Id. at pp. 12-13 (citing Scott Deposition, Exhibit 1 attached thereto, pp. 101-102).

in February are material because the statements were made to persuade the PTO examiner to remove his rejection of the patent application based on the Twin Ram Rig reference.

It is undisputed that statements regarding the date of Scott's meeting with Maritime Hydraulics' Skjelbred and the disclosures made at that meeting contained in the Declaration of Prior Invention are false.  It is also undisputed that the declaration was prepared and submitted to persuade the PTO examiner to withdraw his rejection of claims asserted in the '071 patent based on the Twin Ram Rig reference because Transocean's inventors conceived their invention before they received the Twin Ram Rig drawings.  It is also undisputed that as a result of the statements, the examiner withdrew his rejection of the claims and the patent issued. Moreover, there is no evidence before the court that suggests the PTO examiner had the ability to investigate Transocean's factual description of its disclosures to Maritime Hydraulics and/or when those disclosures were made.  Although Transocean argues that the misstatements contained in the declaration were not made intentionally to deceive the PTO examiner but, instead, were made mistakenly, and in support of this argument cites a list of reasons why Transocean reasonably believed that the disclosures were made in February of 1996, Transocean's evidence merely raises questions of fact that cannot be resolved without assessing the credibility of its witnesses.  Since it is undisputed that statements contained

in the declaration of Transocean's inventors submitted to the PTO examiner in 1999 about the extent and timing of the disclosures made to Maritime Hydraulics were false, and that the declaration containing these statements was made for the purpose of persuading the PTO examiner to withdraw his rejection of the '071 patent claims, the court concludes these statements should be accorded a relatively high degree of materiality and that intent to deceive may be inferred from that high degree of materiality.  See Rohm & Haas, 722 F.2d at 1571 ("there is no room to argue that submission of false affidavits is not material"); Paragon Podiatry, 984 F.2d at 1190 (intent may be inferred from the materiality of affirmative misrepresentations to the PTO, their misleading character, and the inability of the examiner to investigate the facts).  Accordingly, the court concludes that Transocean is not entitled to judgment as a matter of law that it did not engage in inequitable conduct with respect to the Twin Ram Rig Reference.

(c)  Conclusions Regarding the Twin Ram Rig

For the reasons explained above the court concludes that genuine issues of material fact regarding materiality and intent to deceive preclude it from granting Transocean's motion for partial summary judgment that its patents are not rendered unenforceable by statements made during a PTO interview in February of 1998, or by statements made in a Declaration of Prior Invention filed with the PTO in November of 1999.

-23-

2.   <u>GVA Twindriller</u>

GSF alleges that Transocean engaged in inequitable conduct with respect to the GVA Twindriller by "misrepresenting to the PTO that only the 'cover page' of a 'Technical Description from GVA Twindriller, July 15, 1985' was available to Transocean and failing to disclose either of two versions of the entire Twindriller brochure to the PTO."[41]   Transocean argues that it is entitled to judgment as a matter of law that it did not act inequitably with respect to the GVA Twindriller because the reference is cumulative and/or less material than the Twin Ram Rig reference.

(a)   Undisputed Facts

On November 26, 1996, during the prosecution of the original '851 patent, Transocean inventor Robert Scott received a letter from Hugo Heyman at GVA that stated

Thank you for your letter of 22nd November 1996.

The proposed drilling system arrangement does indeed look very interesting and does in many respects have similarities with layouts developed by GVA in 1985, the "GVA Twindriller" (see enclosed front page of the "Technical Description", dated July 15, 1985). We are in consequence with this very much in doubt that the proposed arrangement is patentable. Prior to signing any confidentiality clause we would like to evaluate your proposal in more detail in comparison with our past and present ideas.[42]

---

[41]Defendants' First Amended Answer to Transocean's Second Amended Complaint, Affirmative Defenses, and Amended Counterclaims, Docket Entry No. 83, ¶ 64.

[42]Exhibit 5 attached to Transocean's Enforceability Motion, Docket Entry No. 103.

On April 24, 1997, Scott wrote to Heyman requesting the complete technical description of the July 15, 1985, Twindriller design.[43]

On May 12, 1997, Transocean's patent attorney filed a Supplemental Information Disclosure Statement that disclosed the "Technical Description from GVA Twindriller, July 15, 1985 (Only Cover Page Available to Applicant)."[44]  In subsequent filings with the PTO made on May 28, 1998, with respect to the '781 patent, Transocean cited the GVA Twindriller and repeated its assertion that only the cover page was available to the applicant.[45]  On November 12, 1998, Transocean's patent attorney filed a Supplemental Information Disclosure Statement that disclosed, inter alia, the Horn patent identified as Great Britain document 2,041,836.[46]  On August 12, 1999, with respect to the '071 and '069

----

[43]Exhibit 6 attached to Transocean's Enforceability Motion, Docket Entry No. 103.

[44]Exhibit 7 attached to Transocean's Enforceability Motion, Docket Entry No. 103. Although Transocean admits that it "obtained a full copy of the GVA reference," Transocean presents no evidence showing when it obtained a full copy of the GVA reference. Instead, Transocean merely asserts that "[a]lthough [it] did not have the entire GVA Twindriller Technical Description to submit during the prosecution of the patents, [it] does not rely on this contested issue of fact for this motion." Transocean's Enforceability Motion, Docket Entry No. 103, p. 10 & n.1.  See also Reply to GSF's Response, Docket Entry No. 131, where Transocean asserts that its "motion for summary judgment on the GVA reference is based not on Transocean's lack of intent but on the cumulativeness and lack of materiality of the GVA reference."

[45]See Exhibit 25 attached to GSF's Response, Docket Entry No. 113.

[46]Transocean's Enforceability Motion, Docket Entry No. 103 (citing Exhibits 9 (Horn Patent) and 10 (Supplemental disclosure statement) attached thereto).

patents, Transocean cited the GVA Twindriller and repeated its assertion that only the cover page was available to the applicant.[47] Transocean does not dispute that the entire GVA brochure dated 1986 was in Ray's patent prosecution file.[48]

(b)   Materiality and Intent to Deceive

Transocean argues that GSF cannot establish the materiality element of inequitable conduct with respect to the GVA Twindriller reference because the rig disclosed in that reference is cumulative of three references showing a single derrick and two drilling systems submitted to the PTO:  (1) the Horn patent, (2) the Twin Ram Rig drawings, and (3) the front page of the GVA reference.

**(1)  Horn Patent**

Asserting that it submitted the Horn patent to the PTO upon discovering it at the close of the prosecution of the original '851 patent, Transocean argues that since "the GVA reference is cumulative of the Horn patent, it cannot be considered material to the '781, '069 and '071 patents" because the Horn patent was considered by the PTO during the prosecution of those patents.[49]

---

[47]See Exhibits 25-27 attached to GSF's Response, Docket Entry No. 113.

[48]See Ray Deposition, Exhibit 8 attached to GSF's Response, Docket Entry No. 113, pp. 93-94.

[49]Transocean's Enforceability Motion, Docket Entry No. 103, p. 11.

Transocean argues the GVA reference is cumulative of the Horn patent because "both describe the same type of rig designed to drill two well[s] simultaneously from a single derrick.  Both disclose a single derrick structure. . .  Both disclose two independent drilling systems within the derrick. . . Both disclose drilling on two wells simultaneously."[50]

Since it is undisputed that Transocean did not submit the Horn patent in time for it to be considered by the PTO during the prosecution of the application for the '851 patent, the parent patent of the other patents-in-suit, even assuming without deciding that the GVA Twindriller reference is cumulative of the Horn patent, Transocean's failure to disclose the entire GVA reference for consideration during prosecution of the '851 patent could not be excused on grounds that it is cumulative of the Horn patent.  Moreover, since inequitable conduct during prosecution of the parent patent could render not only the parent patent but also the subsequent patents unenforceable, see Consolidated Aluminum, 910 F.2d at 812, inequitable conduct with regard to the GVA Twindriller reference could be material to all of the patents-in-suit.

### (2) Twin Ram Rig

Since Transocean acknowledges that the Horn patent was submitted too late in the process to be "officially" considered by the PTO during the prosecution of the '851 patent, Transocean

---

[50] Id.

argues that the GVA Twindriller reference is cumulative with respect to the '851 patent because the GVA Twindriller is less material than the Twin Ram Rig reference that was disclosed to and considered by the PTO during prosecution of the '851 patent.[51] Transocean argues that the GVA Twindriller reference is less material than the Twin Ram Rig reference because "[t]he Twin Ram Rig reference not only discloses two drilling systems in a single structure like the GVA Twindriller, but also discloses working on one well simultaneously."[52] Even assuming without deciding that the GVA Twindriller reference is cumulative of the Twin Ram Rig reference, the court cannot conclude that Transocean is entitled to summary judgment on this basis because Transocean acknowledges that the PTO did not consider the Twin Ram Rig reference during prosecution of the '071 patent,[53] and because Transocean continues to argue that the Twin Ram Rig reference does not qualify as prior art because its invention predates the Twin Ram Rig reference.[54]

---

[51]Id.

[52]Id.

[53]Id. at p. 15.

[54]See Memorandum Opinion and Order, Docket Entry No. 135, denying Plaintiff Transocean's Cross-Motion for Partial Summary Judgment (Docket Entry No. 97) that the conception date for its invention precedes the Twin Ram Rig reference, denying Plaintiff Transocean's Motion for Partial Summary Judgment (Docket Entry No. 106) that Transocean's Invention was not Derived from Either Maritime Hydraulics' Twin Ram Rig or Maritime Engineering's ME5000 Brochure, and granting Plaintiff Transocean's Motion for Partial Summary Judgment on Prior Art (Docket Entry No. 108) that the Twin Ram Rig did not anticipate Transocean's invention.

### (3)  GVA Front Page

Asserting that it submitted the illustrated cover page of the GVA brochure, that the cover page discloses the essential components of the entire GVA brochure, and that the remainder of the reference provides only additional technical details that are not relevant to patentability, Transocean argues that even if it possessed the entire brochure, it had no duty to disclose it because the entire brochure was cumulative of the cover page that was submitted to and considered by the PTO.[55]

Citing a November 27, 1996, memorandum sent by Transocean inventor Ray to Transocean's general counsel and the deposition testimony of B. Todd Patterson, GSF argues that the cover page was not cumulative of the full GVA reference.[56]  In the November 27, 1996, memorandum that Ray sent to Transocean's general counsel together with a copy of the GVA cover page, Ray stated:

> I can't tell from the view they've given us if this anticipates our patent or not.  We need to find out more about their concept in order to know, but it seems very important to get to the bottom of it.  I believe they have the equivalent of two derricks joined at the hip and they intend two independent drilling operations to go on, but without more information I can't be sure.  If this is the case, then I think we are OK because we are able to communicate between the two rigs with our design and they can't.  However, it is all speculation at this point.[57]

---

[55]Transocean's Enforceability Motion, Docket Entry No. 103, pp. 1 and 15.

[56]GSF's Response, Docket Entry No. 113, pp. 18-19.

[57]Id. at p. 19 (quoting Exhibit 29 attached thereto).

Patterson testified that the undisclosed parts of the brochure provided additional information relevant to the patentability of Transocean's alleged invention, including the capacities of the two drilling stations, and the ability of each drilling station to advance tubulars to the seabed.[58]

Ray's memorandum shows that one of Transocean's inventors considered it important to obtain the full GVA brochure before deciding whether its invention would be patentable. Since, as one of Transocean's inventors, Ray can reasonably be considered to have been skilled in the art, his memorandum can reasonably be interpreted as evidence that the PTO examiner would also have considered the information disclosed on the GVA Twindriller cover page insufficient to decide if the reference established, by itself or in combination with other available information, a prima facie case of unpatentability of Transocean's claims. Moreover, since Patterson's testimony constitutes at least some evidence that the rest of the brochure contained technical details that a reasonable fact-finder could conclude were not disclosed and therefore not cumulative of details disclosed on the cover page, and that those details could be important to the PTO examiner assessing the patentability of Transocean's invention, the court is persuaded that genuine issues of material fact prevent it from granting Transocean's motion for summary judgment. See Elk Corp. of Dallas

_____

[58]Patterson Deposition, Exhibit 30 attached to GSF's Response, Docket Entry No. 113, pp. 158-164.

v. GAF Building Materials Corp., 168 F.3d 28, 32 (Fed. Cir. 1999)
(finding that withheld patent was material where inventor
memorandum admitted the patent was "of special interest").

    (c)  Conclusions Regarding the GVA Twindriller

    For the reasons explained above the court concludes that
genuine issues of material fact regarding materiality and intent to
deceive preclude it from granting Transocean's motion for partial
summary judgment that its patents are not rendered unenforceable by
its repeated assertions to the PTO that it had disclosed only the
cover page of the GVA Twindriller reference because only the cover
page was available to it.

    3.  Maritime Engineering's ME 5500

    GSF alleges that Transocean committed inequitable conduct with
respect to Maritime Engineering's ME 5500 by "failing to disclose
to the PTO any information regarding the ME 5500, a dual-activity
rig design that predated Transocean's alleged invention."[59]  GSF
argues that

> [i]n light of Transocean's claims covering a rig using
> two stations to perform simultaneous operations on a
> single well, it is clear that documents disclosing the ME
> 5500 rig — a rig with two stations that could be used to
> conduct simultaneous operations on a single well —
> prepared before the filing of Transocean's '851 patent

---

[59]Defendants' First Amended Answer to Transocean's Second
Amended Complaint, Affirmative Defenses, and Amended Counterclaims,
Docket Entry No. 83, ¶ 64.

application, would be important to the Examiner in determining patentability.[60]

Asserting that even if it possessed the ME 5500 reference, it had no duty to disclose it to the PTO because the ME 5500 reference was cumulative of the Davies reference and less material than the Twin Ram Rig reference, both of which were considered by the PTO (except as to the '071 patent), Transocean argues that GSF cannot establish that it withheld the ME 5500 reference with the intent to deceive necessary to establish inequitable conduct.[61]

(a)  Davies Reference

Transocean argues that the ME 5500 was cumulative of the Davies reference because the PTO interpreted the Davies reference as disclosing two rigs used to advance pipe simultaneously.[62]  GSF responds that the ME 5500 was not cumulative of the Davies reference because

> Transocean has denied that the Davies rig could use two stations to work simultaneously on a single well . . . [b]ut . . . has admitted that the ME 5500 rig could use two stations to work simultaneously on a single well[, and that] Transocean's argument is inconsistent with the undisputed facts.[63]

--------

[60]GSF's Response, Docket Entry No. 113, p. 23.

[61]Transocean's Enforceability Motion, Docket Entry No. 103, p. 1; Reply to GSF's Response, Docket Entry No. 131, pp. 14-16.

[62]Transocean's Enforceability Motion, Docket Entry No. 103, p. 16 (citing Office Action, Exhibit 16, attached thereto, ¶ 6 referencing Davies as British '734 reference).

[63]GSF's Response, Docket Entry No. 113, p. 23.

GSF also argues that the ME 5500 cannot be considered "cumulative to Davies with respect to the '071 patent because Transocean distinguished the claims of the '071 patent from Davies by requiring an 'interconnected superstructure.'"

As evidence that the ME 5500's two rigs could be used to work simultaneously on a single well, GSF cites Ray's deposition testimony.[64]   However, Ray did not testify that the ME 5500's two rigs were designed or intended to work simultaneously on a single well.  Instead, Ray testified only that he "would think" that the two rigs could be used to work simultaneously on a single well "[i]f installing a Christmas tree is part of the job":

> Q.   But it can, for example, lower the Christmas tree to the seabed to enable the Christmas tree to be locked onto the wellhead as soon as the BOP is disconnected?
>
> A.   Yeah, I would think.
>
> Q.   So it is designed for both drilling stations to work on a single well?
>
> A.   If installing a Christmas tree is part of the job, yeah.[65]

Although GSF cites language from the "Summary of Major Advantages of the Invention" section of the '069 patent, as evidence that "running a Christmas tree from one station while completing drilling operations with the other station is made

---

[64]Id. (citing Ray Deposition, Exhibit 8 attached to GSF's Response, Docket Entry No. 113, p. 104, lines 9-13).

[65]Ray Deposition, Exhibit 8 attached to GSF's Response, Docket Entry No. 113, p. 104, lines 14-17).

possible by its invention,"[66] GSF has not cited any patent claim that requires this ability.  The court is not persuaded that Ray's testimony establishes that the ME 5500 discloses the ability to use two drill stations to work simultaneously on a single well, or that Transocean's patent claims require the ability to run a Christmas tree from one station while completing drilling operations with the other station.  Moreover, since GSF's expert witness described the ME 5500 as disclosing two drilling assemblies advancing pipe to the seabed simultaneously,[67] and GSF does not dispute that the PTO examiner considered the Davies reference as disclosing effectively the same design, i.e., two drilling assemblies advancing pipe to the seabed simultaneously, GSF has presented no evidence from which a reasonable fact-finder could conclude that the ME 5500 reference is not cumulative of the Davies reference.  See Rolls-Royce, 800 F.2d at 1107 (one reference is cumulative of another reference if both disclose effectively the same design).

Nor is the court persuaded that the ME 5500 is not cumulative to Davies with respect to the '071 patent because the claims of the '071 patent require an "interconnected superstructure."[68]  Although

----

[66]GSF's Supplemental Briefing Regarding Transocean's Motion for Partial Summary Judgment of Enforceability of the Transocean Patents, Docket Entry No. 145, p. 3.

[67]Maus Report, Exhibit 19 attached to Transocean's Enforceability Motion, Docket Entry No. 103, p. 65.

[68]See GSF's Supplemental Briefing Regarding Transocean's Motion for Partial Summary Judgment of Enforceability of the Transocean Patents, Docket Entry No. 145, p. 4.  See also the '071 Patent,
(continued...)

GSF argues that the ME 5500 cannot be cumulative of the Davies reference with respect to the '071 patent because the ME 5500 discloses an interconnected superstructure while the Davies reference does not disclose such a superstructure, and GSF asserts that "Transocean distinguished the claims of the '071 patent from Davies by requiring an 'interconnected superstructure,'"[69] GSF fails to explain why the difference in superstructure design would make the ME 5500 reference more material than the Davies reference. See Rolls-Royce, 800 F.2d at 1107 (affirming judgment of no inequitable conduct where mere existence of "some structural differences" did not establish that those differences rendered the uncited reference more material to the claimed invention).

(b)   Twin Ram Rig Reference

Transocean argues that the ME 5500 was less material than the Twin Ram Rig reference because the Twin Ram Rig discloses "everything in the ME 5500, plus more dual activity claim elements. . . While the ME 5500 was designed to work on two wells simultaneously, the Twin Ram Rig works on one well simultaneously."[70]   GSF responds that

---

[68](...continued)
Exhibit 14 attached thereto, cols. 13-20 (requiring an interconnected superstructure).

[69]Id.

[70]Transocean's Enforceability Motion, Docket Entry No. 103, p. 17.

-35-

[t]he ME 5500 rig . . . is not cumulative over the
Maritime Hydraulics brochure as Transocean argues. . .
[because] Transocean states in its patent that running
the Christmas tree from one station while completing
drilling operations with the other station is made
possible by its invention. . . . This specific method is
expressly disclosed by the ME 5500 documents, which
describe using the smaller rig to run the Christmas tree
while completing drilling operations with the larger
rig.[71]

GSF also argues that the Twin Ram Rig cannot be cumulative with

respect to the '071 patent application because Transocean admits

that the Twin Ram Rig was not considered by the PTO during the

prosecution of that patent application.[72]

Since for the reasons explained in the preceding section

II.B.3.(a) the court has already concluded that GSF has failed to

show that the ability to run a Christmas tree from one drill

station while completing drilling operations with the other drill

station is an element of any of Transocean's patent claims, and

since GSF's response makes no attempt to distinguish structural

elements of the ME 5500 from those of the Twin Ram Rig, the court

is not persuaded that GSF has presented any evidence from which a

reasonable fact-finder could conclude that the ME 5500 reference is

not cumulative of or less material than the Twin Ram Rig reference.

Moreover, since for the reasons explained in the preceding section

II.B.3.(a) the court has already concluded that GSF has failed to

---

[71]GSF's Response, Docket Entry No. 113, pp. 23-24 (citing Ray
Deposition, Exhibit 8 attached thereto, p. 104, lines 9-13).

[72]See GSF's Supplemental Briefing Regarding Transocean's Motion
for Partial Summary Judgment of Enforceability of the Transocean
Patents, Docket Entry No. 145, p. 4.

present any evidence from which a reasonable fact-finder could conclude that the ME 5500 reference is not cumulative of the Davies reference, and since GSF does not argue that the Davies reference was not disclosed to or considered by the PTO during prosecution of the '071 patent, Transocean's admission that the ME 5500 reference is not cumulative to the Twin Ram Rig reference with respect to that patent, does not make the ME 5500 material or non-cumulative to the other art considered by the PTO examiner during the prosecution of that patent, i.e., the Davies reference.

(c)  Conclusions Regarding the ME 5500 Reference

For the reasons explained above the court is not persuaded that GSF has presented any evidence from which a reasonable fact-finder could conclude that the ME 5500 reference is not cumulative of the Davies and Twin Ram Rig references.  Accordingly, the court concludes that Transocean is entitled to judgment as a matter of law that its patents are not rendered unenforceable by its failure to disclose the ME 5500 reference to the PTO during prosecution of the patents-in-suit.

## III.  **Conclusions and Order**

For the reasons explained above the court concludes that Transocean is entitled to judgment as a matter of law that the patents-in-suit are not made unenforceable by its failure to disclose the ME 5500 reference to the PTO, but that genuine issues of material fact preclude the court from granting Transocean's

-37-

motion for judgment as a matter of law that its patents are not made unenforceable by its conduct before the PTO with respect to the Maritime Hydraulics' Ram Rig and the GVA Twindriller references. Accordingly, Plaintiff Transocean's Motion for Partial Summary Judgment of Enforceability of the Transocean Patents (Docket Entry No. 103), is **GRANTED IN PART** and **DENIED IN PART.**

SIGNED at Houston, Texas, on this 17th day of August, 2006.

_____

SIM LAKE
UNITED STATES DISTRICT JUDGE